UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------------- X
                                                          :
AVROHAM SHERMAN,                                          :        18-cv-5359 (ARR) (SJB)
                                                          :
              Plaintiff,                                  :        OPINION & ORDER
                                                          :
      -against-                                           :        NOT FOR ELECTRONIC OR
                                                          :        PRINT PUBLICATION
THE CITY OF NEW YORK, *et al.*,                           :
                                                          :
              Defendants.                                 X
--------------------------------------------------------------------- 

ROSS, United States District Judge:

     Plaintiff, Avroham Sherman, brings this civil-rights action under 42 U.S.C. § 1983 and

New York state law against the City of New York ("the City"), Officer Antonio Hernandez, Officer

Nyaca Stewart, Officer Carlyle Jean Joseph, several unnamed employees of the New York City

Police Department ("NYPD"), and Joshua Eilenberg.[1] Plaintiff's claims arise out of his October

2017 arrest and prosecution for grand larceny, petit larceny, and criminal possession of stolen

property. This opinion and order resolves two motions: (1) *pro se* defendant Joshua Eilenberg's

12(b)(6) motion to dismiss, and (2) the City defendants' 12(c) motion for judgment on the

pleadings, which I have chosen to review as a 12(b)(6) motion for failure to state a claim. For the

following reasons, both motions are granted in part and denied in part.

## BACKGROUND

     On October 5, 2017, plaintiff agreed to loan some money to a recent acquaintance, Joshua

Eilenberg. Am. Compl. ¶ 24, ECF No. 14. The two men arranged for plaintiff to give Eilenberg

$160, and, in exchange, Eilenberg agreed to let plaintiff keep his iPhone 7 as collateral until the

---

[1] Throughout this opinion and order, I refer collectively to the City, Officer Hernandez, Officer Stewart, and Officer Jean Joseph as the "City defendants" because the City is representing all three named NYPD officers. I refer to the named officers collectively as the "defendant officers."

loan was repaid. *Id.* ¶¶ 24–25. The details of this transaction were negotiated over the course of several phone calls, which plaintiff recorded on his own cell phone. *Id.* ¶ 25.

Not long after the deal was consummated, Eilenberg started to regret it. *Id.* ¶ 26. Though he was not able to repay the loan, he "began to demand that Mr. Sherman return his iPhone 7." *Id.* Plaintiff offered to let Eilenberg use his iPhone to conduct any urgent business, and he suggested alternative forms of collateral that Eilenberg could provide in exchange for the loan. *Id.* ¶ 27. None of these proposals satisfied Eilenberg, however, and Eilenberg "began to threaten Mr. Sherman," warning him that it would get "very ugly" for plaintiff if he continued to refuse to give the phone back. *Id.* ¶ 28 (emphasis omitted). Eilenberg told plaintiff that he would use his "connections" to have plaintiff arrested, *id.* ¶¶ 28–29, and he warned plaintiff that he would soon be "sitting in jail, in central booking," *id.* ¶ 29. Plaintiff "dismissed [these] threat[s] as implausible, confid[e]nt that even if Eilenberg followed through, [the police] would . . . see that Eilenberg's account was neither reliable nor truthful." *Id.* ¶ 30.

On the evening of October 6, 2017, plaintiff received a call while he was attending a friend's engagement party. *Id.* ¶ 31. The caller, Officer Antonio Hernandez, informed plaintiff that he was an officer with the 66th police precinct and that he was standing beside "Joshua," who "had just alleged that Sherman had stolen his i[P]hone 7." *Id.* ¶ 31; *see also* Jaffe Decl. Ex. E, 00:00–00:25, ECF No. 34-5. Plaintiff recorded this call on his cell phone.[2] Am. Compl. ¶ 31. Officer Hernandez told plaintiff that he would be arrested if he did not report to the precinct. *Id.* ¶¶ 32–33, 36 (quoting Officer Hernandez as stating, "If I have to do this police report that you stole this cell

---

[2] As I explain below, I consider this recording in deciding the instant motions, as it is "incorporated by reference" in the complaint. *See McLennon v. City of New York*, 171 F. Supp. 3d 69, 88–89 (E.D.N.Y. 2016) ("To be incorporated by reference, the complaint must make a clear, definite and substantial reference to the [recording]." (internal quotation marks omitted) (quoting *Madu, Edozie & Madu, P.C. v. Socketworks Ltd. Nigeria*, 265 F.R.D. 106, 123 (S.D.N.Y. 2010)).

phone, detectives will be coming out to your house."); *see also* Jaffe Decl. Ex. E, 2:05–13. Plaintiff admitted that he was in possession of Eilenberg's cell phone, but he explained that he had the phone only because of the loan agreement he had made with Eilenberg. Am. Compl. ¶ 34; *see also* Jaffe Decl. Ex. E, 00:31–50. He told Officer Hernandez that he had recordings of the loan agreement conversations and he offered to provide them to the police department to prove that he had not stolen the phone. Am Compl. ¶ 34. Officer Hernandez declined to receive the recordings by email or text, however, and continued to demand that plaintiff "leave the engagement party immediately and deliver the phone to the precinct."[3] *Id.* ¶ 35; *see also* Jaffe Decl. Ex. E, 2:15–31. When plaintiff "asked how he was supposed to recover the money he had loaned [Eilenberg] if he simply returned the phone to Eilenberg without repayment," Officer Hernandez told plaintiff that he could pursue this claim in "civil court." Am. Compl. ¶ 35; Jaffe Decl. Ex. E, 1:40–46. Plaintiff continued to object to Officer Hernandez's demands that he appear at the station that night. Am. Compl. ¶ 36. Hernandez grew increasingly frustrated, eventually telling plaintiff, "You're being ridiculous right now . . . . I can't wait to see your face when you are arrested." *Id.*; *see also* Jaffe Decl. Ex. E, 2:25–45.

Plaintiff did not leave the engagement party on the night of October 6 to report to the police station, and it does not seem that he heard anything more from the officers or Eilenberg that night. The next day, on October 7, plaintiff was still "shaken by the Hernandez call," so he decided to call the police himself "to report what had happened." Am. Compl. ¶ 37. At approximately 6:45 P.M., two officers visited plaintiff at his home: Officer Carlyle Jean Joseph and Officer Nyaca Stewart. *Id.* ¶ 38. Plaintiff explained that Eilenberg was seeking to avoid the terms of the loan

---

[3] As stated in plaintiff's complaint, Officer Hernandez "declined" to give plaintiff an email address or phone number where he could send copies of the audio recordings. However, Officer Hernandez indicated that he would listen to the recordings if plaintiff left the engagement party and came to the police station with the cell phone and the recordings that night. *See* Jaffe Decl. Ex. E, 2:19–25.

agreement and that Officer Hernandez had called him the day before to report Eilenberg's false accusation of theft. *Id.* ¶¶ 39–40. "When the officers heard the name 'Hernandez,' [their] interest abruptly intensified." *Id.* ¶ 39. They proceeded to call Officer Hernandez and Eilenberg to learn more about the allegations. *Id.* ¶ 40. During their call with Eilenberg, Officer Jean Joseph and Officer Stewart repeatedly asked him to confirm that he was telling the truth about plaintiff's theft, and they warned him that he could get in trouble if he lied. *Id.* After they finished the phone calls, the officers placed plaintiff under arrest. *Id.* ¶ 41. As he had during his phone call with Officer Hernandez, plaintiff implored Officers Stewart and Jean Joseph to listen to the audio recordings that memorialized his loan agreement with Eilenberg. *Id.* The officers refused, even as plaintiff explained that the recordings were "readily accessible[] and on his person." *Id.* Later, at the police precinct, plaintiff "continued to ask any officer he saw to listen to . . . [the] demonstrable, readily available, recorded proof that Eilenberg had offered his iPhone 7 as collateral for a loan." *Id.* ¶ 44. All of the officers he encountered refused to listen to the recordings, telling him that he "should save [his pleas of innocence] for the judge." *Id.*

Plaintiff was taken to central booking and kept overnight. *Id.* ¶ 45. He "suffered severe emotional distress," experiencing sleep deprivation and physical threats. *Id.* He was charged with grand larceny in the fourth degree, petit larceny, and criminal possession of stolen property in the fifth degree. *Id.* ¶ 47. Plaintiff was released on his own recognizance, and all charges against him were dismissed soon thereafter. *Id.*

Plaintiff filed suit on September 24, 2018, *see* Compl., ECF No. 1, and he later amended his complaint on November 29, 2018, *see* Am. Compl. His amended complaint asserts fifteen causes of action against the defendants. *See id.* ¶¶ 51–164. The bulk of his claims are federal causes of action brought pursuant to 42 U.S.C. § 1983: false arrest, malicious prosecution, denial of the

right to a fair trial, malicious abuse of process, First Amendment retaliation, conspiracy, failure to intervene, and *Monell* liability against the City. *See id.* ¶¶ 51–116. Plaintiff's complaint also asserts several New York state-law claims, including false arrest and malicious prosecution against all of the defendants, *see id.* ¶¶ 122–136, defamation, intentional infliction of emotional distress, and negligent infliction of emotional distress against Eilenberg, *see id.* ¶¶ 137–152, and negligence and negligent hiring, retention, and supervision against the City defendants, *id.* ¶¶ 153–164.[4]

On November 16, 2018, Eilenberg moved to dismiss all claims against him. *See* First Eilenberg Br., ECF No. 12. He later renewed his motion to dismiss after plaintiff amended his complaint. *See* Second Eilenberg Br., ECF No. 18. The City defendants answered plaintiff's amended complaint on December 13, 2018 and January 2, 2019.[5] On February 21, 2019, the City defendants filed a letter requesting a pre-motion conference. *See* Letter, ECF No. 28. They informed the court that they wished to file a motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). *Id.* I provided the parties with a briefing schedule and informed them that I would rule on both motions at the same time. *See* Order, Mar. 4, 2019. Both motions have now been fully-briefed since April 26, 2019. *See* City Defs.' Reply, ECF No. 39.

## STANDARD OF REVIEW

As stated above, there are two motions currently before the court: Eilenberg's 12(b)(6) motion for failure to state a claim, and the City defendants' 12(c) motion for judgment on the pleadings. The City defendants answered plaintiff's amended complaint before they filed the instant motion, and, therefore, their motion was filed as a 12(c) motion for judgment on the

---

[4] In his opposition to the City defendants' motion, plaintiff indicated his intent to voluntarily dismiss his state-law negligence claim. *See* Pl.'s City Opp'n 35, ECF No. 38. Therefore, I do not address the sufficiency of plaintiff's allegations as they pertain to this cause of action.

[5] The City defendants' answers came in two stages. The City and Officer Jean Joseph filed their answers first, *see* ECF No. 23, followed by Officer Hernandez and Officer Stewart, *see* ECF No. 26.

pleadings. However, they acknowledge that this procedural basis for dismissal of the claims against them is technically premature. *See* City Defs.' Br. 3, ECF No. 35. Indeed, because Eilenberg has not yet answered plaintiff's amended complaint and his motion to dismiss was still pending at the time that the City defendants filed their motion, the pleadings are not yet "closed"— a prerequisite for the filing of a 12(c) motion. *See, e.g.*, *Johnson v. Myers*, No. 10-CV-1964 (JS)(WDW), 2011 WL 709481, at *1 (E.D.N.Y. Feb. 18, 2011) (explaining that the pleadings remain open when "valid motions to dismiss remain pending"). At the same time, a 12(b)(6) motion is also technically untimely because a 12(b)(6) motion must be brought "before pleading if a responsive pleading is allowed." *Id.* at *1 (citing Fed. R. Civ. P. 12(b)).

However, "[w]hen a court cannot definitively deem the pleadings closed, it is within the court's discretion to treat a Rule 12(c) motion for judgment on the pleadings as a Rule 12(b)(6) motion to dismiss." *Kutsmeda v. Trust One Mortg. Corp.*, No. Civ.A. 305CV518JRS, 2005 WL 3357347, at *2 (E.D. Va. Dec. 9, 2005). As I informed the parties in my order responding to the pre-motion letters on March 4, 2019, I choose to exercise my discretion to review the City's motion as a 12(b)(6) motion for failure to state a claim. *See also, e.g.*, *Wells Fargo Fin. Leasing, Inc. v. Griffin*, 970 F. Supp. 2d 700, 705–06 (W.D. Ky. Sept. 6, 2013) (deciding, in a factually analogous situation, to review a defendant's 12(c) motion as a 12(b)(6) motion). This decision is especially appropriate because the standard of review for a 12(c) motion and a 12(b)(6) motion is identical. *See Cleveland v. Caplaw Enters.*, 448 F.3d 518, 521 (2d Cir. 2006). Furthermore, the decision to address the City defendants' motion now—rather than forcing the defendants to wait to file the motion until the resolution of Eilenberg's motion—promotes efficient resolution of the issues and allows the court to review both motions simultaneously.

Accordingly, I review plaintiff's amended complaint to ensure that it "contain[s] sufficient

factual matter . . . to state a claim to relief that is plausible on its face." *County of Erie v. Colgan Air, Inc.*, 711 F.3d 147, 149 (2d Cir. 2013) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Though plaintiff need not include "detailed factual allegations" in the complaint, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). In considering both motions, I must construe the complaint liberally, "accepting all factual allegations . . . as true, and drawing all reasonable inferences in the plaintiff's favor." *Lundy v. Catholic Health Sys. of Long Island Inc.*, 711 F.3d 106, 113 (2d Cir. 2013) (quoting *Holmes v. Grubman*, 568 F.3d 329, 335 (2d Cir. 2009)). However, I am "not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). The factual allegations contained in the complaint "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

"Generally, consideration of a motion to dismiss under Rule 12(b)(6) is limited to consideration of the complaint itself." *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006). In limited circumstances, a court can consider materials outside of the pleadings, including "documents incorporated by reference in the complaint" and documents which are deemed "integral" to the complaint because the complaint "relies heavily upon [their] terms and effect." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (quoting *Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006)). As both parties admit, I may consider the plaintiff's audio recording of the call between plaintiff and Officer Hernandez since the recording is incorporated by reference in the complaint, quoted heavily within the complaint, and was relied upon by plaintiff in drafting the complaint. A court can also consider "matters of which judicial notice may be taken" when reviewing a motion to dismiss, *Chambers v. Time Warner Inc.*, 282

F.3d 147, 153 (2d Cir. 2002) (quoting *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993)), but these documents may only be considered if a plaintiff relied upon them in drafting and researching the complaint; "mere notice or possession is not enough." *Id.* Moreover, when the court "takes judicial notice, it does so in order 'to determine what statements [the documents] contained' . . . not for the truth of the matters asserted.'" *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) (quoting *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991)).

The parties ask the court to take judicial notice of several extraneous documents, including a report summarizing Eilenberg's statement to the police, a report of plaintiff's arrest, and a criminal court complaint pertaining to plaintiff's arrest. *See* City Defs.' Br. 4; Pl.'s City Opp'n 9. Though the parties seem to agree that these documents are appropriate for consideration, I decline to review them in resolving this motion. First, there is no evidence that plaintiff relied upon these documents when drafting his complaint; indeed, he observed in his opposition that he had not even seen one of the documents—plaintiff's criminal court appearance record—"prior to the filing of the First Amended Complaint." Pl.'s City Opp'n 6 n.1. Furthermore, because I may not consider the *truth* of any statements contained within these documents, the documents themselves add little value to the instant motions. *See McLennon v. New York City*, No. 13-CV-128 (KAM) (SMG), 2015 WL 1475819, at *4 (E.D.N.Y. Mar. 31, 2015) ("Where the Court takes judicial notice, it does so 'in order to determine what statements [the public records] contained . . . not for the truth of the matters asserted.'" (alterations in original) (quoting *Monroe v. Myskowsky*, No. 12 Civ. 5513 (KPF), 2014 WL 496872, at *1 n.3 (S.D.N.Y. Feb. 6, 2014))). Indeed, it is undisputed that Eilenberg complained to the police before plaintiff was arrested and that the details of Eilenberg's complaint were then shared with prosecutors. The parties' dispute centers around the information that *plaintiff* allegedly told the officers—including the extent to which plaintiff's statements should

have triggered a lengthier investigation before his arrest. Therefore, because the parties disagree about whether these documents represent a complete picture of the pertinent information known by the officers at the time of plaintiff's arrest, I decline to review them at this stage of the litigation.

## DISCUSSION

### I. Plaintiff's complaint does not plausibly allege that Eilenberg was acting under color of law.

*Pro se* defendant Joshua Eilenberg argues that all of the federal claims brought against him must be dismissed because "the Amended Complaint does not plausibly allege that he is a state actor." Second Eilenberg Br. 5. Plaintiff asserts seven federal causes of action against Eilenberg, all of which are brought under 42 U.S.C. § 1983: false arrest, malicious prosecution, denial of the right to a fair trial, malicious abuse of process, First Amendment retaliation, and conspiracy. *See* Am. Compl. ¶¶ 51–89.

To state a claim under § 1983, a plaintiff must "allege that (1) the challenged conduct was attributable at least in part to a person who was acting under color of state law and (2) the conduct deprived the plaintiff of a right guaranteed under the Constitution of the United States." *Rae v. County of Suffolk*, 693 F. Supp. 2d 217, 223 (E.D.N.Y. 2010) (quoting *Snider v. Dylag*, 188 F.3d 51, 53 (2d Cir. 1999)). In other words, "a plaintiff pressing a claim of violation of his constitutional rights under § 1983 is . . . required to show state action." *Sybalski v. Indep. Grp. Home Living Program, Inc.*, 546 F.3d 255, 257 (2d Cir. 2008) (citation omitted). Traditionally, a plaintiff satisfies this requirement by alleging that the defendant "exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *Carlos v. Santos*, 123 F.3d 61, 65 (2d Cir. 1997) (quoting *Kern v. City of Rochester*, 93 F.3d 38, 43 (2d Cir. 1996)). Alternatively, a plaintiff can allege that a private actor undertook "state action" if the private individual engaged in a "plan, prearrangement, conspiracy, custom, or policy"

in conjunction with a state actor, such that the private conduct can fairly be attributed to the state. *Rodriguez v. Winski*, 973 F. Supp. 2d 411, 422 (S.D.N.Y. 2013) (quotation marks and citations omitted). Here, plaintiff argues that Eilenberg's actions constitute "state action" under both theories, asserting alternative claims pursuant to Federal Rule of Civil Procedure 8(d). Specifically, plaintiff alleges that Eilenberg was either a state actor who "once identified himself as a police officer[,] . . . showed [plaintiff] a police uniform that appeared authentic, and . . . claimed [that the uniform] had been issued to him by the N.Y.P.D.," Am. Compl. 4 n.2, or, alternatively, he participated in joint activity with the officers, rendering his private conduct state action. *Id.* at 5 n.2. After reviewing plaintiff's allegations and the relevant case law, I agree with Eilenberg that plaintiff's allegations are insufficient to support either theory of § 1983 liability, and I therefore dismiss the federal claims against Eilenberg.

### A. State Action

"[I]t is by now axiomatic that 'under "color" of law means under "pretense" of law' and that 'acts of officers in the ambit of their personal pursuits are plainly excluded'" from the scope of constitutional liability. *Pitchell v. Callan*, 13 F.3d 545, 547–48 (quoting *Screws v. United States*, 325 U.S. 91, 111 (1945) (plurality opinion)). Though "there is no bright line test for distinguishing 'personal pursuits' from activities taken under color of law," *Pitchell*, 13 F.3d at 548, a police officer defendant does not avoid liability under § 1983 simply by stating that his actions were taken while he was "off-duty." *See Rivera v. La Porte*, 896 F.2d 691, 695 (2d Cir. 1990) ("The off-duty status of an arresting officer does not mean that he is not acting under color of law." (citing cases)). Instead, the central question in determining whether a police officer acted under color of law is whether he "invokes the real or apparent power of the police department." *Pitchell*, 13 F.3d at 548. Importantly, the state action standard is objective—the subjective reaction of the victim is not

determinative. *See id.* at 548–49 (holding that a focus on the victim's "subjective reaction to [the officer's] conduct . . . misses the essence of the color of law requirement"). "Typically, state employment is sufficient to render a person a state actor." *K.K. ex rel Knowles v. Weeks*, No. 1:CV-04-2290, 2007 WL 1455888, at *11 (M.D. Pa. May 15, 2007) (citing *Bonenberger v. Plymouth Twp.*, 132 F.3d 20, 24 (3d Cir. 1997)). However, a state employee who "pursues purely private motives and whose interaction with the victim is unconnected with his execution of official duties does not act under color of law." *Id.* (quoting *Bonenberger*, 132 F.3d at 24).

Plaintiff's allegations are insufficient to support his argument that Eilenberg was a state actor at the time that he told police that plaintiff had stolen his phone. Plaintiff alleges that: (1) Eilenberg told him that he had "connections to the police" and would use those connections to have him arrested,[6] Am. Compl. ¶ 29, (2) Eilenberg previously identified himself as a police officer and showed plaintiff a police uniform that appeared authentic, Am. Compl. 4 n.2, and (3) Officer Hernandez referred to Eilenberg by his first name while on the phone with plaintiff, suggesting that the two men had some familiarity or friendship. Am. Compl. ¶ 31; *see also* Pl.'s Eilenberg Opp'n 7, ECF No. 27.[7] Even plaintiff, however, seems suspicious of Eilenberg's claim of police employment, admitting that "it is unclear what (if any) part of Eilenberg's claim was true, as he remained vague as to whether he was actively employed, previously employed, a part time deputy,

---

[6] Plaintiff's allegation that Eilenberg threatened to use his "connections" is more relevant to his conspiracy claim, *see infra*, Discussion section part II, but there, too, he falls short of plausibly alleging that Eilenberg and the City defendants engaged in joint action.

[7] In his opposition to the City defendants' motion, plaintiff also suggests that Officer Hernandez's silence on the phone when plaintiff suggested that Eilenberg was a police officer "might be construed as proof that Eilenberg was, in fact, a state actor." Eilenberg City Opp'n 30 n.5. I am not persuaded by this argument. It is true that plaintiff implied on the phone that Eilenberg might be getting special treatment because he "is a police officer." *See* Jaffe Decl. Ex. E, 1:47-54. Officer Hernandez does not directly respond to plaintiff's suggestion; instead, he simply says that the reason for his demand that plaintiff return the phone to the station is "because [plaintiff] stole" it. *Id.* In context, then, Officer Hernandez does not admit—tacitly or otherwise—that Eilenberg is or was a police officer. He merely continues to assert his belief that plaintiff is liable for theft and must return the phone immediately.

or on some sort of administrative leave from the department." Am. Compl. 4 n.1. If Eilenberg was not a police officer or otherwise employed by the state, he could not have been "exercis[ing] power 'possessed by virtue of state law.'" *West v. Atkins*, 487 U.S. 42, 49 (1988) (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)). Moreover, even if Eilenberg was employed by the NYPD at the time that he complained to Officer Hernandez, his employment by the state does not automatically mean that he was pursuing official police business or engaging in activities that were conducted under color of law. *See, e.g., Isaacs v. City of New York*, No. 10-CV-4177 (NGG)(RLM), 2012 WL 314870, at *2 (E.D.N.Y. Feb. 1, 2012) (citing cases for the proposition that a police officer does not necessarily act under color of law even if he is "on-duty"). Plaintiff argues that it is premature for the court to decide whether Eilenberg was employed by the NYPD at the time that he made his complaint to the police. *See* Pl.'s Eilenberg Opp'n 7–8. However, this argument ignores the fact that the state action question does not hinge on a defendant's official employment. *See Pitchell*, 13 F.3d at 548 ("[C]ourts look to the nature of the officer's act, not simply his duty status."). Instead, the relevant question is whether plaintiff's allegations support an inference that Eilenberg was engaging in a police activity when he reported the alleged phone theft. *See id.* at 547–48.

In this case, the only action that Eilenberg took was to report a false theft to the police. *See* Am. Compl. ¶¶ 28–31. It is well-established that the mere act of making a complaint to a police officer does not make someone a state actor under § 1983. *See, e.g., Carlos*, 123 F.3d at 65 (holding that defendant was not a state actor when he made a "police complaint in his own name" because "[a]ny citizen may perform these acts" and "they were not made possible only because the wrongdoer[s] [were] clothed with the authority of state law" (quotation marks and citation omitted)). Moreover, even when the complainant is himself a public official employed by the state,

the complainant does not act under color of law simply by filing a report alleging a crime. *See, e.g., Rae*, 693 F. Supp. 2d at 228 (holding that a police officer was not acting under color of law when she complained to the police that she was raped); *Boyce v. Eggers*, 513 F. Supp. 2d 139, 144 (D.N.J. 2007) (holding that a public official was not acting under color of law when "she . . . complain[ed] to the police and fil[ed] a complaint in the same manner as would any private citizen"). Likewise, an individual who provides the police with false information does not become a state actor simply because he lies or misrepresents the facts. *See Harrison v. New York*, 95 F. Supp. 3d 293, 324 (E.D.N.Y. 2015). In short, plaintiff's complaint contains no allegations to support an inference that Eilenberg "performed any 'duties prescribed generally for police officers.'" *Fielder v. Incandela*, 222 F. Supp. 3d 141, 159 (E.D.N.Y. 2016) (quoting *Pitchell*, 13 F.3d at 548)). Though plaintiff may have falsely believed that Eilenberg was engaging in police activity by using his "connections" to make a complaint, plaintiff's subjective beliefs do not transform a private individual into a state actor. *See Pitchell*, 13 F.3d at 548–49 (holding that the "essence of the color of law requirement" centers on the "nature" of the defendant's activities, not the plaintiff's "subjective reaction to [defendant's] conduct"). Therefore, plaintiff's allegations are insufficient to establish that Eilenberg was a state actor.

### B. Joint Action with a State Actor

Plaintiff's complaint also fails to plausibly allege that Eilenberg engaged in joint action with the police officers that would be sufficient to render his conduct "state action" for the purpose of § 1983. "A private party does not act under color of law when []he merely elicits but does not join in an exercise of official state authority." *Serbalik v. Gray*, 27 F. Supp. 2d 127, 131–32 (N.D.N.Y. 1998) (quoting *Auster Oil & Gas, Inc. v. Stream*, 764 F.2d 381, 388 (5th Cir. 1985)). However, a private actor may engage in state action if he was involved in a "plan, prearrangement,

conspiracy, custom, or policy" with the police. *Rodriguez*, 973 F. Supp. 2d at 422 (citation omitted). "[A] private party's 'provision of background information to a police officer does not by itself make [the private party] a joint participant in state action under Section 1983." *Id.* (quoting *Ginsberg v. Healey Car & Truck Leasing Inc.*, 189 F.3d 268, 272 (2d Cir. 1999)). Instead, the plaintiff must allege "facts tending to show agreement and concerted action between the private party and the state actors." *Studifin v. New York City Police Dep't*, 728 F. Supp. 990, 993 (S.D.N.Y. 1990). The pleadings must include "allegations sufficient to create an inference that the private individual defendant and the state official were acting in concert," and the allegations of "conspiracy or concerted action" must be specific and plausible. *Porter-McWilliams v. Anderson*, No. 07-CV-0407 (KMK)(LMS), 2007 WL 4276801, at *2 (S.D.N.Y. Dec. 3, 2007).

Here, plaintiff's allegations of joint action are vague and conclusory. In support of his argument that Eilenberg and the NYPD engaged in concerted action designed to deprive him of his constitutional rights, plaintiff alleges that Officer Hernandez used Eilenberg's first name while on the phone with plaintiff[8] and demanded that plaintiff immediately return the phone to the police department—a "proposition . . . that was more consistent with someone using his police power to do a friend or colleague a favor, than it was an act of legitimate police work." *See* Pl.'s Eilenberg Opp'n 7–8. Plaintiff also suggests that Eilenberg's boast that he had "connections" to the police department supports the inference that Eilenberg was engaged in joint action with the officers. *Id.* Finally, plaintiff argues generally that Officer Hernandez's rough demeanor while on the phone with plaintiff indicates that he was motivated by an ulterior purpose, and that he intended to appease Eilenberg rather than pursue his official police duties. *See, e.g.*, Am. Compl. ¶ 36.

---

[8] As the City defendants observe in their reply brief, Officer Hernandez also called plaintiff by his first name on the phone. *See* City Defs.' Reply 3. The fact that Officer Hernandez used both men's first names, then, does not plausibly support plaintiff's argument that Officer Hernandez and Eilenberg had agreed to engage in concerted action to deprive plaintiff of his constitutional rights.

None of these allegations are sufficient to state a claim that the NYPD and Eilenberg made a joint agreement to violate plaintiff's constitutional rights. As an initial matter, plaintiff does not even allege that Eilenberg and Officer Hernandez made an agreement prior to calling plaintiff, or that Eilenberg and any of the officers actually knew each other prior to the events in question; he simply asks the court to infer from the parties' attitudes and behavior that a joint agreement was established.[9] Though a plaintiff need not plead "with particularity" the details and dates of an agreement, a complaint "must set forth a plausible theory of agreement and concerted action." *Stewart v. Victoria's Secret Stores, LLC*, 851 F. Supp. 2d 442, 445 (E.D.N.Y. 2012). Officer Hernandez's demand that plaintiff return the phone immediately may have been an inappropriate response to Eilenberg's complaint, but it does not suggest that the parties made a prior agreement and engaged in joint action to achieve it. *See, e.g., Ciambriello v. County of Nassau*, 292 F.3d 307, 324 (2d Cir. 2002) ("Absent from [plaintiff's] complaint are any factual allegations suggesting that [plaintiff] conspired with the [state actors.]"). Likewise, Eilenberg's threat to use vague and unspecified "connections" does not support the inference that he actually *used* any connections to engage in joint state action. *Cf. Young v. Suffolk County*, 922 F. Supp. 2d 368, 386 (E.D.N.Y. 2013) ("[A] private party's motivation is irrelevant to the determination of whether that private party acted under color of state law."). Plaintiff's allegations simply amount to the assertion that Eilenberg provided the officers with false information and the officers inappropriately accepted Eilenberg's version of events despite evidence to the contrary. This is patently insufficient to state a claim of joint action, and therefore, all of the § 1983 claims against Eilenberg that are premised on joint state action must fail. *See Fiore v. Rivera*, No. 14-CV-3570(JS)(GRB), 2015 WL 5007938,

---

[9] Even if the officers were familiar with Eilenberg before these events, however, "the mere fact of [their] friendship" does not "reasonably suggest a conspiracy, concerted action, or plan to violate [plaintiff's] rights." *Kohlhausen v. SUNY Rockland Cmty. Coll.*, No. 7:10-CV-3168, 2011 WL 2749560, at *8 (S.D.N.Y. July 13, 2011).

at *4 (E.D.N.Y. Aug. 20, 2015) ("[T]he fact that a private citizen has supplied false information to the police does not transform that person into a state actor.").

## II.     Plaintiff fails to state a claim for conspiracy.

For largely the same reasons, plaintiff fails to state a claim for § 1983 conspiracy. A claim of conspiracy can constitute both a theory of state action liability and a cause of action itself. *See, e.g.*, *Rice v. City of New York*, 275 F. Supp. 3d 395, 403 (E.D.N.Y. 2017) (distinguishing between the two but noting their similarities); *Lopez v. Zouvelos*, No. 13-CV-6474 (MKB), 2015 WL 5657361, at *10 (E.D.N.Y. Sept. 23, 2015) (same); *see also Stewart*, 851 F. Supp. 2d at 445 ("The concepts of acting 'jointly' or in 'conspiracy with' state actors are intertwined."). Both claims require the plaintiff to plead the same core elements: that the state actor and a private party made an agreement to "inflict an unconstitutional injury" and that they committed an overt act "in furtherance of the goal." *Lopez*, 2015 WL 5657361, at *10 (citation omitted). As stated above, none of plaintiff's allegations support an inference that Eilenberg made an agreement with the officers to deprive plaintiff of his constitutional rights, so the conspiracy claim against him is dismissed.

Likewise, plaintiff's allegations are insufficient to state a conspiracy claim against the individual police officers. "Under the intracorporate conspiracy doctrine, officers, agents and employees of a single corporate entity are legally incapable of conspiring together." *Quinn v. Nassau Cty. Police Dep't*, 53 F. Supp. 2d 347, 359 (E.D.N.Y. 1999). However, there is an exception to the general rule if "individuals within a single entity . . . are pursuing personal interests wholly separate and apart from the entity." *Bond v. Bd. of Educ. of the City of New York*, No. 97 CV 1337, 1999 WL 151702, at *2 (E.D.N.Y. Mar. 17, 1999). Though plaintiff alleges that the officers were "state actors in their individual capacities pursuing personal interests," Am. Compl.

¶ 86, he does not explain the nature of those personal interests, and his claim that the individual officers made an agreement amongst themselves to violate plaintiff's rights is strictly conclusory. *See, e.g.*, *id.* ¶ 39 (suggesting, in part, that Officers Stewart and Jean Joseph were involved in a conspiracy with Officer Hernandez because their "interest abruptly intensified" when they heard Officer Hernandez's name). Therefore, the conspiracy claim is also dismissed against the individual NYPD officers. *See, e.g.*, *Ali v. Connick*, 136 F. Supp. 3d 270, 282–83 (E.D.N.Y. 2015) (observing that "[a] conspiracy claim must contain more than conclusory, vague or general allegations," and the exception to the intracorporate conspiracy doctrine requires a reasonable basis for believing that the officers "acted in their own interest and outside the normal course of their duties" (quotation marks and citation omitted)).

### III. Because plaintiff's complaint plausibly alleges that defendants lacked probable cause, he states a claim for false arrest and malicious prosecution.

Plaintiff's false arrest and malicious prosecution claims both rise and fall depending on whether there was probable cause for his arrest. For the following reasons, I conclude that plaintiff's allegations are sufficient at this stage of the litigation to defeat defendants' claim that there was probable cause to arrest and prosecute plaintiff for grand larceny, petit larceny, and criminal possession of stolen property. Accordingly, the City defendants' motion to dismiss plaintiff's false arrest and malicious prosecution claims is denied.

#### A. False Arrest

To state a claim for false arrest under New York law, a plaintiff must allege that: "(1) the defendant intended to confine [him], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." *Singer v. Fulton Cty. Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995) (quoting *Broughton v. State*, 37 335 N.E.2d 310, 314 (N.Y. 1975)). "A § 1983 claim for false arrest, resting on the Fourth Amendment

right of an individual to be free from unreasonable seizures, . . . is substantially the same as a claim for false arrest under New York law." *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) (internal citation omitted) (citing cases). Probable cause to arrest defeats a false arrest claim. *Id.* "In general, probable cause . . . exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Id.* The relevant inquiry focuses on "the facts as the officers knew them in light of the specific elements of each crime." *Gonzalez v. City of Schenectady*, 728 F.3d 149, 155 (2d Cir. 2013).

When a person who claims to be the victim of a crime reports the crime to the police, that tip can form the basis for probable cause to arrest. *See, e.g.*, *Singer*, 63 F.3d at 119. However, if the officer becomes aware of "circumstances that raise doubts as to the victim's veracity," *id.*, the officer's "failure to make further inquiry when a reasonable person would have done so may be evidence of lack of probable cause," *Carlton v. Nassau Cty. Police Dep't*, 761 N.Y.S.2d 98, 99 (App. Div. 2003). "[A]n officer may not disregard plainly exculpatory evidence." *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006) (citing *Kerman v. City of New York*, 261 F.3d 229, 241 (2d Cir. 2001)). At the same time, an officer is not obligated to investigate all defenses that may be raised by the arrestee, nor must the officer "have proof of each element of a crime" before an arrest can be made. *Valade v. City of New York*, 949 F. Supp. 2d 519, 526 (S.D.N.Y. 2013); *see also Rivera v. City of New York*, No. 16519/07, 2011 WL 4537020, at *4 (N.Y. Sup. Ct. 2011).

Plaintiff argues that the officers were aware of several pieces of information that should have led them to question Eilenberg's veracity and conduct additional investigation into the alleged theft. *See* Am. Compl. ¶¶ 34–35, 41, 54. I agree with plaintiff that these allegations are sufficient at this stage of litigation to defeat defendants' claim that there was probable cause. *See, e.g., Sankar*

*v. City of New York*, 867 F. Supp. 2d 297, 306 (E.D.N.Y. 2012) (holding that an officer may need to investigate a victim's complaint when he becomes aware of facts that "give[] rise to a motive for a false accusation" (alteration in original) (quoting *Mistretta v. Prokesch*, 5 F. Supp. 2d 128, 133 (E.D.N.Y. 1998))). Here, plaintiff informed the officers that he entered into a loan agreement with Eilenberg and that Eilenberg was seeking to avoid the terms of that agreement. He calmly explained the basis of this arrangement and the exchange between the parties, and he offered to share readily-accessible proof with the officers that would establish his innocence. *See* Am. Compl. ¶¶ 34–35, 41; *see also* Jaffe Decl. Ex. E.[10] Given plaintiff's clear and persuasive explanation of innocence, the officers should have questioned Eilenberg's credibility and intentions and agreed to review plaintiff's recordings.

Defendants cite *Brodie v. Fuhrman*, No. 07-CV-4212 (DGT), 2010 WL 1189347 (E.D.N.Y. Mar. 29, 2010), to support their argument that plaintiff's admission that he was in possession of Eilenberg's cell phone constituted "independent corroborative evidence to support at least some of [Eilenberg's] assertions." *See* City Defs.' Br. 5–9. In *Brodie*, however, when the officers met with the plaintiff before arresting him, the plaintiff "did not indicate to [the officer] that [the complainant's] claims were false." 2010 WL 1189347, at *6. In contrast, the plaintiff here provided a reasonable explanation for his possession of the cell phone that was entirely consistent with his innocence. Unlike in *Brodie*, plaintiff's explanation was not an admission of guilt or a corroboration of Eilenberg's complaint, but rather an exculpatory statement that should not have

---

[10] The City defendants note that Officer Hernandez did not decline to review plaintiff's recordings; instead, he told plaintiff that he could bring the recordings to the station at the same time that he returned the phone. *See* Jaffe Decl. Ex. E, 2:18–25. However, it is undisputed that Officer Hernandez never listened to the recordings, and he was aware that they existed at the time that he spoke with Officers Stewart and Jean Joseph just before plaintiff was arrested. *See* Am. Compl. ¶ 40. Furthermore, it is undisputed that Officers Stewart and Jean Joseph "refused" to listen to the recordings, despite the fact that they were "readily accessible[] and on [plaintiff's] person." Am. Compl. ¶ 41.

been so quickly dismissed by the officers. *See also Wu v. City of New York*, 934 F. Supp. 581, 588 (S.D.N.Y. 1996) (holding that the police officers lacked probable cause to arrest when they disregarded the "credible [and] coherent" explanation of plaintiff, while "focus[ing] their attention almost exclusively" on the complainant's version of events). Likewise, plaintiff's explanation that he had a prior relationship with Eilenberg should have led the officers to question Eilenberg's credibility—particularly given the fact that the parties' relationship involved a dispute over a purported loan. *See, e.g.*, *Sankar*, 867 F. Supp. 2d at 306 (observing that an officer's awareness of a prior relationship between the parties may give rise to a "need to investigate [a complaint] further" (citation omitted)); *see also Mistretta*, 5 F. Supp. 2d at 133 ("[O]fficers are not absolutely privileged to arrest upon a charge by any private individual who claims to be a victim [because] [s]ome people have axes to grind."). Finally, the fact that plaintiff himself called 911 to explain the situation further supports his claims that he provided the defendant officers with a compelling explanation of his innocence, "thus negating a finding of probable cause." *Levy v. City of New York*, 935 F. Supp. 2d 575, 587 (E.D.N.Y. 2013) (holding that the *plaintiff's* request for police assistance "should have suggested to Defendants" that plaintiff's actions were justified).

At this stage of the litigation, plaintiff's allegations are sufficient to defeat defendants' argument that there was probable cause for his arrest, thus stating a claim for false arrest. *See, e.g.*, *Jocks v. Tavernier*, 316 F.3d 128, 135 (2d Cir. 2003) ("[A] police officer's awareness of the facts supporting a defense can eliminate probable cause.").[11]

---

[11] The City defendants argue that, "at a minimum, defendant officers are entitled to qualified immunity." City Defs.' Br. 14. I disagree. At the time of plaintiff's arrest, it was clearly established that an officer's "failure to make further inquiry when a reasonable person would have done so may be evidence of lack of probable cause." *Carlton*, 761 N.Y.S. 2d at 99; *see also Cerrone v. Brown*, 246 F.3d 194, 199 (2d Cir. 2001) ("A police officer is entitled to qualified immunity . . . if either (1) his 'conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known,' or (2) it was '"objectively reasonable"' for him to believe that his actions were lawful at the time of the challenged act.'" (internal citation omitted) (first quoting *Harlow v. Fitzgerald*, 457 U.S. 800 (1982); then quoting *Lennon*

## B. Malicious Prosecution

"To establish a malicious prosecution claim under New York law, a plaintiff must prove '(1) the initiation or continuation of a criminal proceeding against plaintiff, (2) termination of the proceeding in plaintiff's favor, (3) lack of probable cause for commencing the proceeding, and (4) actual malice as a motivation for defendant's actions." *Manganiello v. City of New York*, 612 F.3d 149, 161 (2d Cir. 2010) (quoting *Murphy v. Lynn*, 118 F.3d 938, 937 (2d Cir. 1997)). To prevail on a § 1983 claim for malicious prosecution, the plaintiff must also establish "a post-arraignment seizure." *Swartz v. Insogna*, 704 F.3d 105, 112 (2d Cir. 2013).

After his arrest, plaintiff was charged with grand larceny in the fourth degree, petit larceny, and criminal possession of stolen property in the fifth degree, and he was required to attend follow-up court appearances. *See* Am. Compl. ¶ 47. As with his false arrest claim, I conclude that plaintiff's allegations are sufficient to support his claim that the officers lacked probable cause for his prosecution. The same probable cause defects that existed at the time of plaintiff's arrest remained at the time that he was first charged with a crime. *Cf. Johnson v. City of Mount Vernon*, No. 10 CV 7006(VB), 2012 WL 4466618, at *5 (S.D.N.Y. Sept. 18, 2012) (holding that probable cause for an arrest does not dissipate at the time of prosecution unless there is "some indication that the authorities became aware of exculpatory evidence between the time of the arrest and the subsequent prosecution"). Likewise, because I conclude that plaintiff's allegations are sufficient to defeat the City defendants' claim of probable cause, plaintiff also plausibly alleges that the defendants' actions were motivated by malice. *See Manganiello*, 612 F.3d at 163 ("A lack of probable cause generally creates an inference of malice." (quoting *Boyd v. City of New York*, 336

---

*v. Miller*, 66 F.3d 416, 420 (2d Cir. 1995))). Furthermore, because it is well-established that certain exculpatory information may defeat probable cause, I cannot say, as a matter of law, that it was objectively reasonable for the officers to have believed that there was probable cause for plaintiff's arrest.

F.3d 72, 78 (2d Cir. 2003))).

The City defendants argue that there is insufficient evidence to establish that any of the individual officers "initiated" plaintiff's arrest; in the alternative, they argue that Officer Jean Joseph—as the officer who signed the supporting deposition for plaintiff's criminal complaint— is the only defendant who was "personally involved" in plaintiff's arrest. *See* City Defs.' Br. 11, 13.[12] "'Initiation' in this context is a term of art." *Rohman v. NYCTA*, 215 F.3d 208, 217 (2d Cir. 2000). Though merely reporting a crime to the authorities does not constitute initiation, a defendant may initiate the prosecution by "play[ing] an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act." *DeFilippo v. County of Nassau*, 583 N.Y.S.2d 283, 284 (App. Div. 1992) (citation omitted); *see also McGrier v. City of New York*, No. 16-CV-5667 (VEC), 2019 WL 1115053, at *4 (S.D.N.Y. Mar. 11, 2019) ("[T]he plaintiff must show that the defendant 'distorted the process by which plaintiff was brought to trial,' such as by 'creat[ing] false information and forward[ing] it to prosecutors' or by withholding 'relevant and material information' from prosecutors." (alterations in original) (quoting *Breeden v. City of New York*, No. 09-CV-4995, 2014 WL 173249, at *10 (E.D.N.Y. Jan. 13, 2014))).

At this stage of litigation, plaintiff has sufficiently alleged that all of the officers initiated his prosecution and can therefore be liable for malicious prosecution. Plaintiff alleges that the each of the defendant officers was aware of the exculpatory information that defeated probable cause, and each officer was also actively involved in making the decision to arrest him. *See* Am. Compl. ¶¶ 34–35, 41. Viewing the complaint in the light most favorable to plaintiff, it is reasonable to infer that the officers were all involved in "withholding material information" from prosecutors— including plaintiff's credible claims of innocence and his repeated requests that the officers listen

---

[12] As I stated earlier, I have chosen not to consider the parties' extraneous documents, including the criminal complaint and supporting deposition, in deciding this motion.

to the audio recordings. *See, e.g.*, *Ramos v. City of New York*, 729 N.Y.S.2d 678, 689 (App. Div. 2001) (holding that plaintiff stated a claim for malicious prosecution where there was evidence that the defendant withheld "evidence that negated probable cause"). Therefore, defendants' motion to dismiss this claim is denied.

### IV.    Plaintiff states a claim for failure to intervene.

Plaintiff argues that the defendant officers are liable for failing to intervene to stop his unlawful arrest. *See* Pl.'s City Opp'n 18–19. "An officer who fails to intercede is liable for the preventable harm caused by the actions of the other officers where that officer observes or has reason to know . . . that a citizen has been unjustifiably arrested." *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994). "For an officer to be held liable, he or she must have had a realistic opportunity to intervene to prevent the violation from happening." *Sanabria v. Tezlof*, No. 11-CV-6578 (NSR), 2016 WL 4371750, at *5 (S.D.N.Y. Aug. 12, 2016). Additionally, the plaintiff must establish a "primary constitutional violation" before a defendant can be held liable for failing to intervene to stop the violation from occurring. *Id.* (quoting *Forney v. Forney*, 96 F. Supp. 3d 7, 13 (E.D.N.Y. 2015)). As I have already concluded, plaintiff's allegations are sufficient to state a claim for the primary violation of false arrest.

Defendants argue that plaintiff's failure to intervene claim must be dismissed because he fails to identify which officers are primarily responsible for his false arrest and which are responsible for failing to intervene. *See* City Defs.' Br. 9. A police officer cannot be liable for both participating directly in an underlying violation and failing to intervene to stop it from occurring. *See Ramos v. City of New York*, No. 15 Civ. 6085 (ER), 2017 WL 3267736, at *10 (S.D.N.Y. July 31, 2017). While it is true that plaintiff does not clearly indicate which of the defendant officers are liable for which cause of action, he is "entitled to discovery to determine which officers

participated directly [in his arrest] and which officers were present and failed to intervene." *Matthews v. City of New York*, 889 F. Supp. 2d 418, 444 (E.D.N.Y. Sept. 5, 2012); *see also Lanorith v. Truscelli*, No. 15-CV-617 (NGG) (LB), 2017 WL 3634600, at *13 (E.D.N.Y. Aug. 22, 2017) ("Although a failure to intervene claim cannot ultimately be sustained against a direct participant in the alleged primary violation, Plaintiff is entitled to plead a failure to intervene claim as an alternative to direct liability.").[13] Therefore, this claim survives the City defendants' motion to dismiss.

## V. Plaintiff fails to state a claim for denial of the right to a fair trial.

Plaintiff claims that the City defendants deprived him of his right to a fair trial by "creat[ing] and/or ratif[ying] false evidence of a theft." Am Compl. ¶¶ 66–72. "A person is deprived of her constitutional right to a fair trial when 'an (1) investigating official (2) fabricates evidence (3) that is likely to influence a jury's decision, (4) forwards that information to prosecutors, and (5) the plaintiff suffers a deprivation of liberty as a result.'" *Folk v. City of New York*, 243 F. Supp. 3d 363, 374 (E.D.N.Y. 2017) (quoting *Jovanovic v. City of New York*, 486 F. App'x 149, 152 (2d Cir. 2012)). Plaintiff's allegations in support of this claim are "vague, conclusory, and generalized," and he fails to explain with any degree of specificity the alleged fabrications, how they were communicated to the prosecutors, or how they would have been likely to influence a jury. *See, e.g., Hutchins v. Solomon*, No. 16-CV-10029 (KMK), 2018 WL 4757970,

---

[13] The City defendants argue that Officer Hernandez cannot be held liable for either false arrest or failure to intervene because "Officer Hernandez was not present at plaintiff's arrest." *See* City Defs.' Br. 9. I reject this argument. Plaintiff clearly alleges that Officers Jean Joseph and Stewart spoke on the phone with Officer Hernandez to learn more about Eilenberg's complaint before they decided to arrest plaintiff. *See* Am. Compl. ¶ 40. Plaintiff also alleges that Officer Hernandez, like the other officers, was aware of the facts that defeated probable cause. *See id.* ¶¶ 34–36. This is sufficient, at this stage, to establish that Officer Hernandez was either a direct participant in the arrest or failed to intervene despite a reasonable opportunity to do so. *See, e.g., Jackson v. Tellado*, 236 F. Supp. 3d 636, 654 (E.D.N.Y. 2017) (observing that an individual can be a direct participant in a false arrest if he "authorizes, orders, or helps others to do the unlawful acts" (quoting *Terebresi v. Torreso*, 764 F.3d 217, 234 (2d Cir. 2014))).

at *16 (S.D.N.Y. Sept. 29, 2018) ("Conclusory statements that officers fabricated evidence do not suffice to state a claim for the denial of a fair trial."). As I have established, plaintiff persuasively alleges that the defendant officers lacked probable cause for his arrest; however, this does not automatically mean that the officers "fabricated evidence," and plaintiff has provided no additional factual allegations that would support his claim. Therefore, this claim is dismissed.

## VI. Plaintiff does not plausibly allege a collateral objective sufficient to state a claim for malicious abuse of process.

A defendant can be held liable for malicious abuse of process if he "(1) employs regularly issued legal process to compel performance or forbearance of some act (2) with intent to do harm without excuse or justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process." *Cook v. Sheldon*, 41 F.3d 73, 80 (2d Cir. 1994). "A 'collateral objective' is not the same as a 'malicious motive' and must exist 'beyond or in addition to [the] criminal prosecution." *Folk*, 243 F. Supp. 3d at 375 (alteration in original) (quoting *Savino v. City of New York*, 331 F.3d 63, 77 (2003)). "In other words, '[a]buse of process resembles a form of extortion by which the defendant invokes legal process to coerce the plaintiff into doing something other than what the process necessitates.'" *Id.* (alteration in original) (quoting *Krebs v. United States*, No. 98 CIV. 2590(MBM), 1999 WL 185263, at *5 (S.D.N.Y. Mar. 31, 1999)).

Plaintiff alleges that the officers were motivated by several collateral objectives, including: "wrongfully restor[ing] custody of the cell phone . . . to . . . Eilenberg," "retaliat[ing] for Mr. Sherman's refusal to immediately leave a party," "retaliat[ing] for having to complete arrest paperwork," and "assist[ing] colleagues in avoiding potential disciplinary problems." Am Compl. ¶ 75. These allegations fail to plausibly support "[t]he crux of a malicious abuse of process claim"—the requirement that the defendant acted in pursuit of an "improper purpose," not simply "with an improper motive." *Douglas v. City of New York*, 595 F. Supp. 2d 333, 344 (S.D.N.Y.

2009). Many of plaintiff's alleged "collateral objectives" are simply a part of the process of conviction itself—not *collateral* to that process. *See, e.g.*, *Savino*, 331 F.3d at 77 ("[I]t is not sufficient for a plaintiff to allege that the defendants were seeking to retaliate against him by pursuing his arrest and prosecution. Instead, he must claim that they aimed to achieve a collateral purpose beyond or in addition to his criminal prosecution."). Moreover, while "protecting one's employment could be an objective sufficient to establish the collateral objective," plaintiff provides no factual allegations to support an inference that any of the defendant officers were in danger of losing their jobs or that their actions were motivated by the possibility of avoiding official discipline. *Jovanovic v. City of New York*, No. 04 Civ. 8437, 2010 WL 8500283, at *9–10 (granting summary judgment on malicious abuse of process claim where there was "no evidence that [the defendant] believed he could lose his job[] if he did not arrest [plaintiff]"). Accordingly, because plaintiff's allegations of a collateral objective do not raise plaintiff's right to relief "above the speculative level," *Twombly*, 550 U.S. at 555, this claim is dismissed.

## VII. Plaintiff fails to state a First Amendment violation claim.

Plaintiff alleges that the defendant officers violated his First Amendment rights when they arrested him in retaliation for his "express refusal to follow an unlawful order—i.e., to immediately leave a party at 9:45 P.M., in order to surrender a cell phone which [the] officers knew, or had reason to know, was in his rightful custody." Am. Compl. ¶¶ 79–84. To state a First Amendment retaliation claim, a plaintiff must show that: "(1) he has an interest protected by the First Amendment; (2) defendants' actions were motivated or substantially caused by his exercise of that right; and (3) defendants' actions effectively chilled the exercise of his First Amendment right." *Curley v. Vill. of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001). Even if plaintiff could establish the other elements of his claim, he fails to establish the second element: that his unlawful arrest was caused

by his failure to return the cell phone to Eilenberg after Officer Hernandez called him on October 6. Indeed, plaintiff admits that he was not arrested by Officer Hernandez on October 6; instead, he was not arrested until well into the following day, after two additional officers arrived at his house and made several phone calls to inquire into Eilenberg's story. *See* Am. Compl. ¶¶ 37–41. These allegations are insufficient to establish that the defendant officers' decision to arrest plaintiff was "motivated or substantially caused by the Plaintiffs' protected speech." *New Page at 63 Main, LLC v. Incorp. Vill. of Sag Harbor*, No. 15-cv-2433 (ADS)(AKT), 2016 WL 8643493, at *10 (E.D.N.Y. Mar. 19, 2016), *aff'd*, 674 F. App'x 23 (2016) (quotation marks omitted). As a result, plaintiff's First Amendment retaliation claim is dismissed.

## VIII.  Plaintiff fails to state a claim for *Monell* liability.

In order to state a claim for municipal liability, a plaintiff must demonstrate that the unconstitutional action that caused his injury was taken "pursuant to [an] official municipal policy of some nature." *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978). In other words, the plaintiff must establish that the municipality "was the moving force behind the alleged injury." *Triano v. Town of Harrison*, 895 F. Supp. 2d 526, 532 (S.D.N.Y. 2012) (internal quotations omitted) (quoting *Roe v. City of Waterbury*, 542 F.3d 31, 37 (2d Cir. 2008)). There are four ways to demonstrate the existence of a policy or custom that gives rise to *Monell* liability: (1) a formal policy; (2) actions or decisions taken by a municipal official with final policymaking authority; (3) "a practice so consistent and widespread that . . . [it] constitutes a custom or usage"; or (4) "a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees." *Jones v. Westchester County*, 182 F. Supp. 3d 134, 158 (S.D.N.Y. 2016) (citation omitted). In this case, plaintiff alleges that the City is liable for plaintiff's

constitutional violations because it failed to adequately train and supervise its police officers. *See* Pl.'s City Opp'n 31–35; *see also* Am. Compl. ¶¶ 96–116.[14]

To prevail on a *Monell* claim based on a municipality's failure to train or supervise its employees, a plaintiff must show that the failure "amounts to deliberate indifference to the rights of persons with whom [municipal employees will] come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989); *see also Triano v. Town of Harrison*, 895 F. Supp. 2d 526, 534 (S.D.N.Y. 2012). Deliberate indifference "is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (quoting *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 410 (1997)). "Thus, when city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program." *Id.* (citing *Brown*, 520 U.S. at 407). As a result, "[a] pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Id.* at 62 (quoting *Brown*, 520 U.S. at 409). Likewise, a failure-to-supervise claim is premised on an allegation that the "need for more or better supervision . . . was obvious," and that the City "made 'no meaningful attempt' to forestall or prevent the unconstitutional conduct.'" *Amnesty Am. v. Town of West Hartford*, 361 F.3d 113, 127 (2d Cir. 2004) (quoting *Vann v. City of*

---

[14] The City defendants also seem to interpret plaintiff's complaint as raising a general allegation that the City operated an "official policy or custom" that is itself unconstitutional. *See* City Defs.' Br. 20–21. Because plaintiff does not pursue this argument in his opposition, however, this claim is waived. *See* City Defs.' Reply 19. In any case, plaintiff's complaint does not point to any official policy that could plausibly have caused his constitutional injury, so any claim that an unconstitutional official policy is the source of his injury also fails as a matter of law. *See, e.g.*, *Zahra v. Town of Southold*, 48 F.3d 674, 685 (2d Cir. 1995) ("[T]he mere assertion . . . that a municipality has . . . a custom or policy is insufficient in the absence of allegations of fact tending to support, at least circumstantially, such an inference" (quoting *Dwares v. City of New York*, 985 F.2d 94, 100 (2d Cir. 1993))).

*New York*, 72 F.3d 1040, 1049 (2d Cir. 1995)).

Before a municipality can be held liable for a failure to train or supervise, the plaintiff must demonstrate three things: (1) the "policymaker knows 'to a moral certainty' that her employees will confront a given situation," (2) "the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult" or "there is a history of employees mishandling the situation," and (3) "the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights." *Jenkins v. City of New York*, 478 F.3d 76, 94 (2d Cir. 2007) (quoting *Walker v. City of New York*, 974 F.2d 293, 297–98 (2d Cir. 1992)). Additionally, where a plaintiff alleges that the City's failure to train its employees caused his injury, he must point to an identifiable deficiency in the City's training program, which is "closely related to the ultimate injury." *Harris*, 489 U.S. at 391; *see also Johnson v. City of New York*, No. 06 CV 09426, 2011 WL 666161, at *4 (S.D.N.Y. Feb. 15, 2011) (noting that plaintiff's *Monell* allegations failed because they did not "identify procedural manuals or training guides, nor d[id] they highlight relevant particular aspects of police training or supervision" (citation omitted)).

In support of his claim, plaintiff alleges numerous instances of police misconduct in a wide variety of factual circumstances, ranging from flawed murder investigations to allegations that several police officers in the Bronx were at one point engaged in a widespread practice of "'fixing' tickets for friends and relatives." *See* Am. Compl. ¶¶ 102–11. These allegations arise in settings that are entirely dissimilar from the plaintiff's core claim: that the officers who investigated Eilenberg's complaint failed to adequately consider evidence of his innocence before making an arrest. Given the distinct factual contexts in which these instances arose, plaintiff cannot plausibly allege that any alleged training or supervision deficiency that may have led to the cited misconduct

also caused his own injury. *See, e.g.*, *Peterec v. City of New York*, No. 14-cv-309 (RJS), 2015 WL 1027367, at *7 (S.D.N.Y. Mar. 6, 2015) ("Plaintiff's references to unconnected, irrelevant litigation are patently inadequate to allege a policy or custom of the City.").

Moreover, a failure-to-train claim must be "based on more than the mere fact that . . . [prior] misconduct occurred in the first place." *Amnesty Am.*, 361 F.3d at 130. Here, plaintiff does not provide any evidence about the City's alleged faulty response to the prior misconduct, nor any information about "how better or different training could have prevented the challenged conduct." *Id.* Plaintiff's failure to cite to a "specific deficiency" in the City's training programs also renders his claim "entirely conclusory," as he "does not specify what type of training the officers lacked, and there are no facts" in the complaint that support his argument that "the City's alleged failure amounted to deliberate indifference." *Selvaggio v. Patterson*, 93 F. Supp. 3d 54, 78 (E.D.N.Y. 2015). Likewise, because plaintiff presents no allegations that "suggest that the City did not meaningfully investigate the allegations" of misconduct against specific officers, he cannot support his failure-to-supervise claim. *Id.* at 79; *see also Lehal v. Cent. Falls Detention Facility Corp.*, No. 13cv3923 (DF), 2016 WL 7377238, at *12 (S.D.N.Y. Nov. 21, 2016) (dismissing plaintiff's failure-to-supervise claim in part because plaintiff failed to establish a "causal relationship" between any alleged supervision failures and his injuries).

Accordingly, plaintiff's *Monell* claim is dismissed.

## IX.    State-Law Claims

Both the City defendants and *pro se* defendant Eilenberg argue that the court should decline to exercise supplemental jurisdiction over plaintiff's state-law claims. *See* City Defs.' Br. 22–24; Second Eilenberg Br. 9. However, because I conclude that plaintiff's complaint states a claim for several federal causes of action—false arrest, malicious prosecution, and failure to intervene—I

retain jurisdiction over the associated state-law claims, since they arise out of the same common nucleus of operative facts. *See* 28 U.S.C. § 1367(a) ("[I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."); *see also Dimps v. Taconic Corr. Facility*, No. 17-cv-08806, 2019 WL 1330957, at *2 (S.D.N.Y. Mar. 25, 2019), *appeal docketed*, No. 19-975 (2d Cir. Apr. 15, 2019) (observing that supplemental jurisdiction permits the federal court to exercise jurisdiction over both "nonfederal claim[s]" and "independent part[ies]" as long as the additional claims "arise[] out of the same common nucleus of operative facts").

In the alternative, the City defendants argue that the court should dismiss plaintiff's state-law claims on their merits.[15] City Defs.' Br. 22. Because the New York state-law torts of false arrest and malicious prosecution are "substantially the same" as the analogous claims under § 1983, *Jocks*, 316 F.3d at 134 (quoting *Weyant*, 101 F.3d at 852), I deny the City defendants' motion to dismiss these claims.[16] However, I grant the City defendants' motion to dismiss plaintiff's negligent hiring, retention, and supervision claim. To state such a claim, a plaintiff must allege facts that demonstrate "that the employer 'knew or should have known of the employee's propensity for the conduct which caused the injury' prior to the injury's occurrence." *Ehrens v. Lutheran Church*, 385 F.3d 232, 235 (2d Cir. 2004) (citation omitted). Yet plaintiff's complaint

---

[15] Eilenberg's motion made no arguments about the merits of plaintiff's state-law claims against him. *See* Second Eilenberg Br. 9. Therefore, because this issue has not yet been briefed, I do not address the sufficiency of plaintiff's allegations for stating a claim against Eilenberg under New York state law.

[16] I am also unpersuaded by the City defendants' argument that the defendant officers are entitled to qualified immunity under state law, because I cannot conclude that the defendant officers' actions were reasonable or consistent with acceptable police practice." *Bancroft v. City of Mount Vernon*, 672 F. Supp. 2d 391, 408 (S.D.N.Y. 2009); *see also supra* note 11.

merely cites generally to the elements of this cause of action, without indicating any specific facts that would demonstrate that the City had notice of the officers' potential for misconduct. *See, e.g.*, *Green v. City of Mount Vernon*, 96 F. Supp. 3d 263, 297 (S.D.N.Y. 2015) (holding that a "conclusory assertion" that the City is "guilty of negligently supervising [its] employees" is insufficient (citing record)). Accordingly, this claim is dismissed.

## CONCLUSION

For the foregoing reasons, both motions are granted in part and denied in part. The following claims survive this opinion and order: the constitutional and state-law false arrest and malicious prosecution claims against the defendant officers, the failure to intervene claim against the defendant officers, and all state-law claims against Eilenberg. All other claims are dismissed with prejudice because they fail as a matter of law. *See Ellis v. Chao*, 336 F.3d 114, 127 (2d Cir. 2003) ("[I]t is well established that leave to amend a complaint need not be granted when amendment would be futile.").

SO ORDERED.

Date:  May 16, 2019                    _____/s/_____
       Brooklyn, New York                    Allyne R. Ross